Opinion delivered June 23, 1886.

[No. 4087.]

F. C. VAUGHN v. THE STATE.

THEFT—BURDEN OF PROOF—FACT CASE.—If, when his possession of the alleged stolen property is first challenged, the accused makes a reasonable and probably true explanation of the same, the burden rests upon the State to disprove the explanation.   See the statement of the case for evidence *held* insufficient to support a conviction for cattle theft, in view of the explanation of the accused, and the evidence taken as a whole.

APPEAL from the District Court of Coryell.   Tried below before the Hon. T. L. Nugent.

The conviction was for the theft of one head of cattle, the property of C. V. Cavitt, in Coryell county, Texas, on the twen-

ty-third day of November, 1883. A term of two years in the penitentiary was the penalty assessed against the appellant.

W. H. Taylor was the first witness for the State. He testified that in November, 1883, he and defendant lived near each other in the neighborhood of Eagle Springs, in Coryell county, Texas. About day light on the morning of the twenty-third of said month, the witness heard the report of a gun fired in the vicinity of Eagle Springs. The report was followed by the bellowing of a calf, and that, in turn, by the bellowing of other cattle. After eating his breakfast the witness went to a store, in the village of Eagle Springs. While there, the defendant's son, a lad ten or eleven years of age, came into the store and asked for some salt. Witness asked the boy if he had been getting some fresh meat at his house. The boy replied that they had not. Witness remained in the village two or three hours, and went to the point where he heard the calf bellow. He found the hide of the calf of a JC cow hanging from the limb of a tree in a very dense thicket. It was secured to the limb with a fish line. A few yards beyond the tree on which he found the hide hanging, the witness found the fore foot of a calf that had been recently killed. About fifty yards further from the hide, he found the entrails of the animal. Upon making these discoveries witness went back to Eagle Springs and reported the facts to J. D. Henderson, the constable of that precinct. Witness and one Howard, directed by the said Henderson, returned to a point near the tree on which the hide was hanging. This was between twelve and one o'clock. They had been but a short time in ambush when they saw a man who proved to be the defendant going towards the hide. When he emerged from the brush into the open near witness and Howard, they covered him with their guns, and told him that they were instructed by Henderson to arrest any one found in the thicket in the vicinity of the hide. Defendant asked why he was placed under arrest. Witness replied that a calf had been killed there on that morning. Defendant replied that if that was all they might as well turn him loose, as he could and would tell them all about it. He then said: "I killed the calf; you can go your way, and I will go mine." He then explained that when he got up early on that morning he saw a hawk sitting on a small tree, but ten feet high, and that the hawk was evidently maneuvering to capture some small chickens under the tree; that he returned to his house to get his shot gun, but was told by his wife that the gun was loaned out; that he then got his Winchester

rifle, returned and aimed it at the hawk; that just as he was about to fire the hawk flew, and that as he lowered the gun it was discharged; that he then heard the bellowing of a calf, and went around the thicket whence the noise came, and found the calf plunging forward and floundering around, and that it finally fell forward on its head and broke its d—d neck. The thicket, he said, was between him and the calf, and that the calf was shot in the nose, on the left side, below the brain. He said that, after finding that he had shot the calf, he went to his neighbor, Mr. Lawrence, to tell him about the matter, but that Mr. Lawrence was not at home; that he then went to the house of Meyers and told him about it, and that he, his son-in-law, John Norris, and Meyers then skinned the calf. He said, further, that while he, Norris and Meyers were cutting up the meat, Lawrence. came by in a wagon, when he told him how the accident had happened, and gave him a quarter of the beef. He said that he told his wife, family, Lawrence, Meyers and Norris, that he was going to see the owner of the calf and pay him for it; that he used the beef upon the suggestion of his wife, daughters and son-in-law, who urged that paying for the calf would make the matter all right.

Cross-examined, the witness testified that he and Howard did not accuse the defendant of killing the calf before they arrested him. Defendant was in arrest when he told witness and Howard how he happened to kill the calf. They asked him no questions before they arrested him. Witness could not state the distance from the defendant's house to the tree on which the hide was found hanging. The distance, however, was considerable. The calf was slaughtered about seventy-five yards from where the hide was found. The slaughter place was in an open space surrounded by timber. Witness and Howard did not go up to the defendant's house, nor did they make any search for the beef. Defendant said that the beef was at his house. He did not hesitate when asked where the calf's head was, but went into the brush and brought it out. It showed that the calf had been shot centrally through the forehead. Neither the foot nor the entrails were covered up when found. The foot and entrails were each about fifty yards from the hide, but in different directions from it. Both the foot and the entrails were found in dense thickets of small timber and brush. When witness and Howard first saw defendant near the hide, they did not call to him. On the contrary, the defendant saw them and joined them

of his own accord. Witness's feelings towards defendant were unfriendly. Soon after the shot was fired in the morning, several head of cattle, including the mother of the deceased calf, all bellowing, fled towards witness's house. Witness knew Clarence V. Cavitt, the alleged owner of the deceased calf. Cavitt, when the calf was killed, lived three or four miles distant from the defendant's house. Witness knew the calf killed to be the calf of Cavitt's JC cow.

Henry Howard was next introduced by the State. His narrative began at the point when he and Taylor went to the hide and arrested defendant. In detail, from that point, he testified substantially as did Taylor.

C. V. Cavitt testified, for the State, that he owned the cattle in Coryell county in the JC brand. He owned the cow in that brand, which, after the killing of the calf, was pointed out to him by Taylor as the mother of the calf. He never saw that calf, and never saw the mother until she was pointed out to him by Taylor. Witness never gave his consent to defendant, or any body else, to take or kill that calf. Witness's father, some years ago, owned a large stock of cattle, that ranged in Bell, McLennan, and Coryell counties. That stock was branded JC. When, a few years ago, his father gathered his stock and removed to a ranch out west, he left a considerable remnant of cattle branded JC on the range in the counties named, which remant he gave to witness, since which time witness has owned the said remnant, and controlled them. Witness's father was now dead, but his, witness's, brothers and sisters have always, since he owned them, recognized witness's title to the JC cattle in Coryell county.

The State next introduced in evidence the record of marks and brands of Coryell county, which showed JC to be the recorded brand of J. C. Cavitt, the father of C. V. Cavitt. The State closed.

John Norris was the first witness for the defendant. He testified that he was the defendant's son-in-law, and lived in the same house with him in November, 1883. On the morning that the calf was killed witness heard the defendant come into the house and ask his wife for his shot gun. His wife told him that his shot gun was not at home. Witness saw the defendant get his Winchester rifle and fire it at a hawk. The gun was fired just as the hawk flew. The hawk was sitting on a bush in the thicket, about five feet from the ground. Witness went off, and

presently came back and said that he had played h—l and killed the Cavitt calf. Witness and defendant then went to where the body of the calf was lying. The animal had been shot on the left side of the nose, about two inches below the brain. It was not yet dead, and defendant cut its throat. The calf did not bellow, but the ground showed signs of a struggle. Defendant ran the other cattle away from the calf, and said that he was going to leave the body where it was. Witness advised him to skin it, use the meat, and see Cavitt and pay for it. Defendant refused to do so, until advised to the same effect by his wife and daughter and Mr. Meyers. Immediately after breaksast defendant went to Lawrence's house to relate the facts to him. Not finding Lawrence at home, he went to Meyers's house and told him. Meyers returned with defendant, and witness, defendant, and Meyers went to and skinned the calf. The calf was slaughtered in an open glade, about fifty yards distant from the house. From that point the beef and hide were taken to a tree with limbs strong enough to hold their weight. Lawrence came by in a wagon while the beef was being cut up, and the defendant told him how the calf was killed. Defendant gave Lawrence a quarter of the beef, Myers another portion, and put the balance away in his smoke house. After dinner defendant ordered his horse saddled to ride to Eagle Springs, for the purpose of reporting the transaction. While his horse was being saddled, defendant went to bring the hide to the house. Witness next saw him under arrest in Eagle Springs.

Cross-examined, the witness said that the hawk, when shot at by the defendant, was not higher from the ground than five feet. Defendant could not see the calf from where he stood when the shot was fired. The calf was not shot centrally through the forehead, but the ball entered the head at the left side of the nose, just below the brain. There were trees at the point where the calf was slaughtered, upon which the hide could have been hung, but they were not near so suitable for that purpose as those at a greater distance to which the hide was taken.

Mrs. Norris, testifying that she was an eye witness to the whole transaction, corroborated her husband in every particular.

William Lawrence testified, for the defense, that he passed defendant's house between ten and eleven o'clock on the morning that the calf was killed. He saw defendant, and Norris, and Myers cutting up the carcass of the calf, near the defendant's

house.   Defendant told him how he killed the calf, and that after dinner he was going to Eagle Springs and report the facts. Witness told him that, under the circumstances, he saw no wrong in using the beef and paying for it.   Defendant then gave witness a quarter of the meat.   On his arrival at home, witness was informed that defendant came to his house inquiring for him early on that morning.

Cross-examined, the witness testified that he approached the defendant's house from the direction of the hide, and saw buzzards collected near the tree on which the hide was said to have been hung.   Defendant told the witness that he undertook to shoot a hawk, and shot the calf by accident.   Witness was arrested for complicity in the transaction at the same time that the defendant was.

J. P. Vaughn, the defendant's son, testifying for his father, corroborated the witnesses John and Mrs. Morris in every material particular.   On his cross-examination, he stated that he went to the store in Eagle Springs, and saw the witness Taylor. He asked for coffee, however, and not salt.   He did tell Taylor, when asked about fresh meat, that they had none at his father's house.   He made that statement to Taylor because the defendant told him to say nothing about the killing of the calf, as he wanted to attend to that matter himself.

J. H. Mullins testified, for the defense, that he knew the defendant for many years in the State of Mississippi.   His reputation for honesty in Mississippi was good.   Witness did not know his reputation in Coryell county, Texas.   The defense closed.

W. H. Taylor, recalled for the State, testified that the defendant's reputation for honesty in Coryell county, Texas, was bad both before and after the killing of the calf.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   Appellant's statement made to the State's witness Taylor, when asked by the latter about the killing of the calf, to the effect that he had killed it accidentally while attempting to shoot a hawk, is not only reasonable and probable, under the circumstances developed, but is, in our opin-

ion, abundantly established as a fact by the several witnesses of defendant, one of whom (Lawrence) was not a member of his family. These statements and declarations of defendant were proven by the State, and the other testimony of the prosecution did not disprove them, or show that they were untrue. It devolved upon the State to show that they were false. (Garcia v. The State, 26 Texas, 209.)

Because the evidence is insufficient to support the verdict and judgment, the judgment is reversed and the cause remanded.

*Reversed and remanded.*